**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:09-CR-0072-02** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **CHANCE D. BONNER** | : | |

## MEMORANDUM

Presently before the court is a motion (Doc. 97) by defendant Chance D.

Bonner ("Bonner") to suppress evidence of statements that he made to law

enforcement officers over the course of two months' time during an investigation in

2008. The court held an evidentiary hearing on defendant's motion on November

23, 2009, (see Doc. 239), after which the parties filed supplemental briefs in support

of their respective positions, (see Docs. 248, 267). For the reasons that follow, the

motion will be denied.

## I.    Statement of Facts

On February 25, 2009, Bonner was indicted by a grand jury. The indictment

contains fifteen counts and charges Bonner with criminal conspiracy to commit an

offense against the United States in violation of 18 U.S.C. § 371, three counts of

interference with interstate commerce by threats or violence in violation of 18

U.S.C. § 1951, three counts under 18 U.S.C. § 924(c)(1)(A)(i)-(ii) for use of a firearm

during and in relation to a crime of violence, two counts of taking a motor vehicle

from another by force and violence or by intimidation in violation of 18 U.S.C.

§ 2119, and one count of possession of a firearm by a convicted felon in violation of

18 U.S.C. § 922(g).  (See Doc. 1.)  On March 12, 2009, Bonner entered a plea of not guilty to the indictment.  (Doc. 45.)

The events underlying Bonner's indictment date back to the spring of 2008, when police departments in multiple south-central Pennsylvania jurisdictions began investigating a series of armed robberies that occurred in and around Cumberland County, Hamilton Township, and Franklin County.  (See Doc. 216 at 2.)  On the morning of May 13, 2008, Harrisburg detectives Donald Hefner ("Hefner") and John O'Connor ("O'Connor") executed a search warrant on Bonner's home.  (Doc. 239 at 5-6.)  Bonner was not present at the residence, but his mother provided Hefner with his cellular telephone number.  (Id. at 6.)  Hefner attempted to contact Bonner, and Bonner returned Hefner's call at 8:50 a.m. that morning.[1]  (Id.)

According to Hefner, Bonner stated, "I know I'm wanted by the police.  What are my charges?"  (Id.)  Hefner explained that there were outstanding warrants for defendant's arrest on charges of robbery and burglary.  (Id.)  Hefner then asked Bonner about the robbery charge and Bonner replied with an ambiguous reference to individuals named "D.C." and Jennifer Bass ("Bass").  (See id. at 7.)  Hefner characterized the conversation as one in which Bonner "was trying to negotiate a turn-in with me.  He wanted me to talk to a state parole officer and he wanted to negotiate a turn-in.  That's what the phone call was about."  (Id. at 8.)

---

[1] Hefner testified that he has known Bonner since at least 1994 when Hefner arrested him for selling crack cocaine.  (Doc. 239 at 13.)

Unbeknownst to Hefner at the time, Bonner was in New York City with Bass, his girlfriend. (See id. at 12, 16.)

The following day, Bonner and Bass were taken into custody in Suffolk County, New York on the outstanding robbery warrant. (Id. at 16.) Bonner and Bass had two children together, both of whom were present during their parents' arrest, and both of whom were taken into protective custody. (See id. at 26.) Officers in New York thereafter contacted O'Connor, and O'Connor immediately departed for New York in order to transfer Bonner back to Harrisburg. (Id.) O'Connor was accompanied on this trip by Jeffrey Kurtz ("Kurtz"), a detective with the Carlisle Borough police department. When the detectives arrived at the precinct in Suffolk County, they met with Bonner in an interview room and told him he was not a target of their investigation. (Id. at 17, 29-30.) Kurtz testified that

> We [then] informed [defendant] of Miranda.[2] Neither he, being O'Connor, or I had an actual rights paper with us. We both left Carlisle, Harrisburg[,] pretty quickly that afternoon. We spoke with him [defendant], he agreed to speak with us. He said he understood his rights. We began to talk about some robberies in Cumberland and Dauphin counties. We spoke with him for probably half an hour, maybe forty minutes.

(Id.) Kurtz added that Bonner specifically agreed to speak with the detectives outside the presence of an attorney. (Id. at 18.) O'Connor independently verified

---

[2] Kurtz advised Bonner that "he had the absolute right to remain silent, that anything he said could and would be used against him in a court of law. He had the right to talk to an attorney. If he could not afford an attorney one would be appointed to represent him before speaking with us, and if he decided to speak with us he could stop at any time he wished." (Doc. 239 at 28.)

3

that "Detective Kurtz told [defendant] his constitutional rights, and [defendant] said he understood his rights and wanted to talk and he wanted to cooperate."[3] (Id. at 41.) For his part, defendant testified that he could not recall whether he was informed of his Miranda rights.

Notwithstanding his apparent willingness to cooperate, Kurtz testified that Bonner was "a little bit reluctant to want to give up information." (Id. at 19.) O'Connor characterized Bonner's behavior as "minimizing and giving BS." (Id. at 42.) Feeling that they were not making progress—and recognizing that defendant was somewhat "agitated" and "tired"—the detectives ended the interview without obtaining any useful information. (See id. at 19, 42.) Bonner claims that before they terminated questioning that evening, O'Connor "said specifically that if I were to assist them in the investigation, that I would be able to see my son again and that they would make substantial steps to seeing to them getting back to Harrisburg and me being able to see them before we were to leave." (Id. at 105.) Both officers deny that any such statements were made regarding the status of Bonner's children. (See id. at 31, 51.)

Detectives O'Connor and Kurtz took custody of Bonner and Bass the next morning in order to return them to Harrisburg. (Id. at 20.) Prior to departure, the

---

[3] Bonner testified that between 8 and 9 a.m. on the morning of his arrest, he was using both marijuana and PCP. As a result, Bonner claims that he was "still high" later that morning and continued to experience the effect of PCP during his questioning by Kurtz and O'Connor. (Doc. 239 at 101-02, 104.) Detectives Kurtz and O'Connor did not arrive at the precinct in Suffolk County until approximately 8:30 p.m. (Id. at 27.)

detectives completed extradition paperwork at the Suffolk County courthouse and

Bonner and Bass appeared before a judge to waive their right to contest

extradition.  (See id. at 43-44.)  The state of New York had appointed Bonner

defense counsel for this extradition hearing, and at hearing's end, Bonner's

attorney approached O'Connor and said, "Look, I told him [defendant] I don't want

him to talk to you.  I don't want you to talk to him."  (Id. at 43-44.)  O'Connor agreed,

and the detectives departed shortly thereafter, Bonner and Bass in tow.  Kurtz

assumed driving responsibilities and Bass was seated in the driver's seat; Bonner

and O'Connor rode in the backseat of the vehicle.  (Id. at 43.)

According to O'Connor, Bonner initiated conversation almost immediately

after they began driving.  (See id. at 54.)  He first inquired, "how much time am I

looking at?"  (Id. at 44.)  Bonner then repeatedly offered to cooperate if the charges

were dropped against Bass, and suggested that he "do eight years."  (See id. at 44-

45.)  O'Connor explained that he could not speak with Bonner, but Bonner "kept

trying to bring it up."  (Id. at 46.)  At that point, O'Connor said,

> 'Look, dude, I can't talk to you.  Your lawyer told me I can't talk to you,'
> and he [defendant] said, 'Fuck that, I'm going to talk anyways.'  I was
> like okay, here we go, and he then went around and he wouldn't admit
> directly that he was involved in the stuff on the West Shore.  He kept
> saying, 'Well, let's say I did but I didn't do it,' . . . .
>         So I said, he kept going on about, 'Yeah, but I didn't really do it,
> but I'm going to say I did it.  Will I get eight years for this and will you
> drop charges against her?'  And I said, 'Dude, I can't make promises,'
> and this went on and on, . . . .

(Id.)  As the ride progressed, Bonner continued to volunteer information, stating,

among other comments, that:  (1) he "did it"; (2) he "was the one who robbed that

guy and it was a drug deal gone bad"; and (3) he "was the good robber. I was the one reassuring the victim."[4] (See id. at 44, 47.) Neither detective provided Bonner with Miranda warnings during the return trip.[5] (Id. at 34, 48.) When the officers arrived in Harrisburg, Bonner was placed into custody at the Dauphin County prison and was assigned a court-appointed attorney, Dale Kevin. (See id. at 109.)

On May 19, 2008, Lower Paxton Township police detective Steve Alcorn ("Alcorn") and Swatara Township police detective George Haney ("Haney") visited Bonner at the Dauphin County prison. (Id. at 60.) The purpose of this visit was to question Bonner regarding multiple home invasion robberies which had occurred in neighboring jurisdictions. (Id. at 61.) Before commencing a substantive discussion, Alcorn advised Bonner of his Miranda rights, and Bonner expressed a willingness to cooperate outside the presence of his attorney.[6] (See id. at 62, 79.) Bonner then provided detailed information concerning multiple robberies. Bonner

---

[4] O'Connor stated that at some point, Bass turned to Bonner and said, "You're stupid for talking." Bonner replied, "Fuck you, I'm trying to help you out," and continued to offer information. (Doc. 239 at 47.)

[5] Bonner claims that O'Connor initiated conversation by offering leniency in exchange for cooperation. (Doc. 239 at 107-08.) However, he also acknowledged that he "was all over the place" during the trip, and that he "did most of the talking." (Id. at 125.) O'Connor testified that he never made any promises to Bonner, but simply told him that any cooperation "will be noted." (Id. at 50.)

[6] According to Alcorn, Bonner "agreed to speak with us, telling us that he had already given information to Detective O'Connor from the City of Harrisburg as well as Detective Kurtz from Carlisle PD." (Doc. 239 at 62.) Haney added that Bonner "said that he wanted to give us whatever he had to help himself out." (Id. at 79.)

testified that he has no recollection of receiving <u>Miranda</u> warnings, and that he was told he would not be prosecuted if he was cooperative. (<u>See id.</u> at 109-10.) Alcorn denies that any such promises were made. (<u>Id.</u> at 63.)

On May 20, 2008, Bonner was interviewed at the Dauphin County prison by two Pennsylvania State Troopers, Frank Hershey ("Hershey") and Aaron Martin ("Martin"). (<u>Id.</u> at 66-67.) Before they began to converse, Martin advised Bonner of his <u>Miranda</u> rights, and Bonner completed a written waiver form indicating that he was aware of his rights and was willingly waiving them. (<u>See id.</u> at 65, 68, 75.) Bonner claims that before signing the waiver, he was told he would not be prosecuted. (<u>See id.</u> at 109.) He also contends that he requested the presence of his attorney, but was told he did not "need [his] lawyer right now." (<u>Id.</u> at 110.) During the interview, Bonner provided several inculpatory statements regarding multiple central Pennsylvania robberies.

On June 18, 2008, Haney returned to the Dauphin County prison, but then transported Bonner to the Swatara Township police department for an interview with Scott Endy ("Endy"), an agent for the Bureau of Alcohol, Tobacco, and Firearms. (<u>Id.</u> at 80, 85-86.) At the stationhouse, Bonner was again advised of his <u>Miranda</u> rights, he appeared to understand them, and he agreed to speak with Endy. (<u>Id.</u> at 80.) Endy also presented Bonner with a waiver of rights form, which Bonner signed. (<u>Id.</u> at 82, 86-87.) Prior to signing this form, Endy explained to

Bonner that he was a target of their investigation.[7] (Id. at 82.) Bonner then provided information pertaining to multiple robberies and narcotics trafficking in and around central Pennsylvania.

Troopers Hershey and Martin returned to interview Bonner at the Dauphin County prison on July 9, 2008. (Id. at 67-68.) Hershey provided Miranda warnings before the interview began, and Bonner agreed to cooperate and signed a waiver of rights form. (See id. at 67-68.) Bonner then provided several inculpatory statements regarding his involvement in robberies in and around the area.

That same day, Haney transported Bonner back to the Swatara Township police department for a second interview with Endy. (Id. at 79.) Endy provided Bonner with a letter explaining that he was the target of a federal investigation and that he had a right to court-appointed legal representation if he so desired. (Id. at 90-91.) Endy then proceeded to show Bonner an album containing photographs of "persons of interest" in the matter, and Bonner supplied information concerning multiple individuals. (Id. at 80-81.) According to Endy, Bonner also provided a handwritten document listing the names of several individuals and their telephone numbers. (Id. at 88-89.) Co-defendant Donald Scott appears on this list. (Id. at 89.)

---

[7] Bonner claims that he was not informed that he was a target of the investigation and was again promised that he would not be prosecuted if he were to cooperate. (Doc. 239 at 112.) In addition, Bonner contends that he expressed a desire to contact his attorney and that the officers allowed him to do so on a nearby telephone. (See id. at 113.) Haney does not specifically recall Bonner's request, but stated that "[i]f he wanted to call his attorney I would have let him call his attorney. . . . There was a phone right there at the interview table where we spoke with him." (Id. at 82.)

Endy testified that Bonner provided the document freely, and indicated that no threats or promises were made in order to obtain it.  (Id. at 89.)  Bonner contends that the document was stolen from his belongings during a cigarette break.  (See id. at 115.)

## II.  **Discussion**

In Miranda v. Arizona, the Supreme Court held that law enforcement officers must inform an individual of certain rights before he or she may be subjected to custodial police interrogation.  384 U.S. at 444.  These rights include the right to remain silent and the right to have counsel—either retained or appointed—present during questioning.  Id.  Failure to apprise an individual of his or her Miranda rights may render inadmissible any statements procured by the interrogation.  An individual apprised of his or her rights may waive them so long as the waiver is made "voluntarily, knowingly, and intelligently."  Id.  If a suspect invokes the right to counsel, police must cease interrogation until an attorney is present, Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), and any statements made in counsel's absence must be suppressed, United States v. Tyler, 164 F.3d 150, 162 (3d Cir. 1998).

Bonner provided statements to law enforcement on seven different occasions between May 13, 2008 and July 9, 2008.  He contends that in each of these instances, he was either not provided Miranda warnings or his statements were elicited through false promises of leniency or coercion, or were provided without an appropriate waiver.  What is more, defendant claims that he invoked his right to counsel in five of the conversations, but that his requests were rebuffed each time.

Finally, Bonner argues that his Fourth Amendment rights were infringed upon when a handwritten list of names and telephone numbers was allegedly stolen from him by police officers on July 9, 2008. The court will individually address each of the instances in which Bonner spoke with law enforcement officers in order to assess the merit of the above-described arguments.

## A. **May 13, 2008**

On May 13, 2008, Bonner conversed with detectives Kurtz and O'Connor for approximately forty-five minutes. Kurtz testified that he provided Miranda warnings prior to commencement of this conversation, and that Bonner expressed a willingness to cooperate and speak outside the presence of his attorney.[8] Bonner testified that he "can't remember" whether Miranda warnings were provided, and that he "didn't ever see no [sic] Miranda warnings that day." (Doc. 239 at 104.) The court finds that Kurtz provided Bonner with Miranda warnings prior to the beginning of their interview. Not only did Kurtz attest to this fact, but it was

---

[8] Bonner argues in his brief in support of the motion to suppress that he invoked the right to counsel at this meeting. (See Doc. 113 at 3.) On the stand, however, Bonner did not offer testimony in support of this assertion.

independently confirmed by O'Connor.  Both of these detective were credible and consistent in their testimony, and the court credits their version of events.[9]

The more difficult aspect of the instant inquiry concerns Bonner's waiver of his rights.  To determine the validity of a <u>Miranda</u> waiver, courts analyze the "totality of the circumstances surrounding the interrogation" to determine whether they "reveal both an uncoerced choice and the requisite level of comprehension." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).  Waiver must be proved by the government by a preponderance of the evidence.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 168-69 (1986).  The court finds that neither Kurtz or O'Connor coerced Bonner by promising leniency from prosecution, nor were any threats made with respect to

---

[9] Bonner notes that Kurtz's after-action report of June 25, 2008 is silent with respect to whether he provided <u>Miranda</u> warnings, while a subsequent report dated July 25, 2008 specifically states that Bonner "was informed of Miranda and agreed to talk with us."  (Doc. 248, Att. 1, 2.)  According to Bonner, "[i]t is pure peradventure to conclude that two such experienced officers . . . would fail to mention the provision of Miranda Rights . . . in an initial police report when the information is most fresh in their memories."  (Doc. 248 at 2.)  The court rejects defendant's argument as entirely speculative and unsupported by fact.  First, the initial report was written over month after Kurtz's interview, and silence with respect to <u>Miranda</u> appears to be no more than an inadvertent omission. Furthermore, both detectives testified that <u>Miranda</u> warnings were provided, and this testimony is reinforced by the July 25, 2008 report articulating the same.  Thus, defendant's argument is without merit.

Bonner's children.[10]  The detectives nonetheless conveyed a falsehood to Bonner

when they explained that he was not a target of the investigation.  Given that

O'Connor executed a search warrant at Bonner's residence the preceding day, as

well as the two outstanding warrants for Bonner's arrest, the detectives' statement

is at the very least lacking in veracity.

When police officers employ deception in order to secure a rights waiver, the

procured statements are inadmissible under the Fifth Amendment.  See Moran, 475

U.S. at 421; United States v. Velasquez, 885 F.2d 1076, 1088-89 (3d Cir. 1989).  The

false information provided in the instant matter went directly to Bonner's

connection to the crime and implied that he could speak freely with less fear of

consequence.  See Velasquez, 885 F.2d at 1088-89 (explaining that false statements

which go "directly to the suspect's connection to the crime" are more likely to

invalidate an otherwise voluntary waiver).  In fact, Bonner alluded to the confusion

---

[10] Bonner testified that "O'Connor initially came to me while I was in the room and he said, he just was harping on the kids saying about like, you know, me being an unfit father and her [Bass] being an unfit mother and we'll never see them again, they knew they were going to catch up with me up here, and the kids will stay here if they have something to do with it, and they'll go to some service and I'll never see them again."  (Doc. 239 at 105.)  Bonner further claims that "O'Connor . . . said specifically that if I were to assist them in the investigation that I would be able to see my son again and that they would make substantial steps to seeing to them getting back to Harrisburg and me being able to see them before we were to leave."  (Id.)  O'Connor directly contradicted this assertion during his testimony, explaining that he did not threaten Bonner or make any promises, and that he did no more than respond to Bonner's questions inquiring about the whereabouts of the children.  (See id. at 51-52.)  As stated above, the court finds the narrative of events supplied by Kurtz and O'Connor to be credible, and credits their recollection.

this tactic engendered, especially when it was coupled with the lingering effects of his drug use earlier in the day.[11]  (See Doc. 239 at 123-25; see also Doc. 239 at 100-01.)  After analyzing the totality of the circumstances, the court finds that Bonner's Miranda waiver was not voluntary; his partial intoxication and the nature of the detectives' deceptive comment are sufficient to invalidate Bonner's rights waiver.[12]

In sum, the court finds that Bonner was provided appropriate Miranda warnings on May 13, 2008, but that he voluntarily waive those rights before engaging Kurtz and O'Connor in conversation.  Consequently, any incriminating statements that defendant provided on May 13, 2008 shall be suppressed for reasons compelled by the Fifth Amendment.

### B.  May 14, 2008

On May 14, 2008, Kurtz and O'Connor transported Bonner from New York to Harrisburg.  Bonner began to volunteer information and was attempting to negotiate a cooperation agreement almost as soon as he sat down in the police cruiser.  O'Connor undertook to deflect Bonner's inquiries, explaining that he was

---

[11] Bonner testified that marijuana use typically affects him for "maybe two or three hours," while PCP "could last a day or two."  (Doc. 239 at 101.)

[12] The court notes that defendant was uncooperative during the May 13 interview, and Kurtz terminated the session when he realized defendant would not divulge any useful information.  (See Doc. 239 at 19, 42.)  In fact, the government acknowledges the relative unimportance of the May 13 interview in its supplemental opposition brief, stating that defendant did not confess to his involvement in any of the robberies.  (See Doc. 267 at 7.)  All that Bonner acknowledged was his possession of a firearm, which he obtained from a co-defendant.  (Id.)

not authorized to negotiate an agreement, and indicating that Bonner's ultimate punishment was not within the detectives' control. Nonetheless, Bonner continued to make statements regarding the robberies in question, and several of his comments are of an incriminating nature. Neither Kurtz or O'Connor read Bonner his rights at any point during the journey, and he claims that his statements should accordingly be suppressed.

The government argues that the statements made in transit to Harrisburg were voluntary and not a response to custodial interrogation. In <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980), the Supreme Court held that "the special procedural safeguards outlined in <u>Miranda</u> are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." <u>Id.</u> at 300. The Court went on to explain:

> [T]he <u>Miranda</u> safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under <u>Miranda</u> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

<u>Id.</u> at 300-01. Providing an arrestee with information pertaining to potential charges does not, standing alone, violate <u>Miranda</u>. <u>See</u> <u>United States v. Benton</u>, 996 F.2d 642, 644 (3d Cir. 1993).

The court finds that Bonner was not subject to interrogation during the May 14 vehicular journey, but instead insisted on volunteering the information that he provided. Both Kurtz and O'Connor testified that Bonner's commentary was

unprovoked, and that O'Connor repeatedly advised Bonner that the discussion was inappropriate and unwise. Bonner concedes that he "did most of the talking" and was "all over the place," (Doc. 239 at 125), an admission which essentially comports with O'Connor's portrayal of Bonner as a gratuitous volunteer of information. The evidence indicates that Bonner was attempting to negotiate some manner of agreement in exchange for cooperation—similar, in fact, to the "turn-in" agreement he was attempting to negotiate with Hefner two days prior to his arrest. Viewing the totality of the evidence, the court finds the detectives' testimony credible, adopts their narrative of events, and concludes that the statements made by Bonner on May, 2008 were voluntarily provided. Therefore, their admission does not offend the Fifth Amendment.

**C.** <u>**May 19, 2008**</u>

On May 19, 2008, Bonner was interviewed by detectives Alcorn and Haney. Alcorn provided Bonner with <u>Miranda</u> warnings and Bonner indicated that he was willing to cooperate. Both officers testified that Bonner did not request the presence of his court-appointed attorney. For his part, Bonner testified that he did not recall whether he received <u>Miranda</u> warnings, (<u>see</u> Doc. 239 at 109), and stated that Alcorn and Haney promised prosecutorial lenience in exchange for information, (<u>id.</u> at 109-10). The court finds that the unequivocal—and consistent—testimony of Alcorn and Haney is credible, and concludes that defendant was appropriately notified of his <u>Miranda</u> rights; in contrast to the

officers' recollection, Bonner's testimony is uncertain and lacks credibility.[13]  The

preponderance of the evidence thus demonstrates that Bonner was fairly warned of

his Fifth Amendment rights and he validly waived these rights.  Therefore, the

admissibility of any statements made on May 19 does not offend <u>Miranda</u>.

    **D.**    **<u>May 20, 2008</u>**

      On May 20, 2008, Bonner was interviewed at the Dauphin County prison by

troopers Hershey and Martin.  At the outset of the conversation, Martin read

Bonner his rights and Bonner signed a waiver of rights form.  Bonner testified that

before he signed the form, he was told he was "not going to be charged with this

stuff."  (Doc. 239 at 110.)  This explanation lacks credibility.  The waiver of rights

form clearly indicates that any statements provided during the interview may be

used for purposes of prosecution.  <u>See</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 373

(1979) (holding that an express written or oral statement of waiver of the right to

remain silent or of the right to counsel is "usually strong proof of the validity of that

---

[13] In his brief in support of the motion to suppress, Bonner claims that he invoked his right to counsel during the May 19 interrogation, but that his invocation was ignored.  (<u>See</u> Doc. 113 at 14-15.)  Bonner's assertion is unsupported by the record.  Both Alcorn and Haney testified that Bonner expressed a willingness to speak outside the presence of his attorney, (Doc. 239 at 63, 79), and Bonner did not contradict their recollection when he took the stand himself.  Furthermore, because the court finds that Bonner waived his <u>Miranda</u> rights, it also concludes that Bonner waived his Sixth Amendment right to have counsel present during his interrogation.  <u>See</u> <u>Montejo v. Louisiana</u>, --- U.S. ---, 129 S. Ct. 2079, 2085-87 (2009) (explaining that when a defendant is read his or her <u>Miranda</u> rights and waives those rights, this waiver is typically effective for purposes of his or her Sixth Amendment right to counsel in the absence of a prior, affirmative invocation of the Sixth Amendment right).

waiver").  Furthermore, both troopers testified that Bonner's rights were explained, and that he freely waived them at the beginning of the interview, in the absence of promises.  There is simply no evidence—other than Bonner's self-serving testimony—that any promises were made to induce his cooperation.

Bonner also contends that he requested the presence of his court-appointed attorney, but was told he did not "need [his] lawyer right now."  (Doc. 239 at 110.) Again, the court finds Bonner's version of events to lack credibility, and instead credits the testimony of the troopers, both of whom testified that Bonner specifically agreed to speak outside the presence of counsel.  (See id. at 67, 75.) Bonner's willingness to cooperate is further evidenced by his completion of the waiver of rights form, wherein he acknowledges his right to counsel and his waiver of same.[14]  In short, the preponderance of the evidence establishes that Bonner was apprised of, and validly waived his Fifth Amendment rights during the May 20 interview.

**E.    June 18, 2008**

On June 18, 2008, Bonner was interviewed by Endy and Haney at the Swatara Township police department.  Prior to beginning the interview, Endy read Bonner his rights and obtained from him a written waiver.  Endy also told Bonner that he was a target of a federal investigation.  Bonner claims that he was not

---

[14] To the extent that Bonner is challenging the admissibility of the statements under the Sixth Amendment, the court finds that by waiving his Fifth Amendment rights, Bonner also exercised a valid waiver of his Sixth Amendment right to counsel.  See Montejo, --- U.S. ---, 129 S. Ct. at 2085-87.

presented with the waiver of rights form until the end of the interview, and he denies that he was ever told that he was a target of Endy's investigation. Again, the court finds the testimony of Endy and Haney—which is consistent and also in accord with the written waiver Bonner executed—to represent a credible recollection of the June 18 meeting. Thus, the court concludes that defendant was informed of <u>Miranda</u>, that he understood his rights, and that he validly waived them before speaking with Endy and Haney.

Bonner also appears to argue that he invoked his right to counsel, but that his invocation was ignored. Specifically, Bonner claims that he expressed a desire to contact his attorney at the commencement of discussions, and he testified that the officers allowed him to do so. (<u>See</u> Doc. 239 at 113.) When Bonner purportedly contacted his attorney's office using a stationhouse telephone, however, he received either an answering service or secretary. (<u>See id.</u>) Haney did not recall Bonner making a request for counsel, but noted, "If he wanted to call his attorney I would have let him call his attorney." (<u>Id.</u> at 82.) Bonner now contends that his Sixth Amendment right to counsel was contravened when he requested his attorney and questioning did not immediately cease. (<u>See</u> Doc. 113 at 14-15.)

The court is not persuaded by Bonner's argument. First, the court credits the testimony of Endy and Haney, both of whom testified that Bonner was fully apprised of his right to counsel, waived that right both orally and via written signature, and expressed a desire to cooperate. (<u>See</u> Doc. 239 at 82-83, 87-88.) Neither officer recalled Bonner invoking his right to counsel, and Bonner's self-

serving testimony to the contrary is the only evidence in support thereof. Because the court finds that Bonner waived his Fifth Amendment right to counsel and did not subsequently invoke that right, his Fifth Amendment waiver also constitutes a valid waiver for Sixth Amendment purposes. See Montejo v. Louisiana, --- U.S. ---, 129 S. Ct. 2079, 2085-87 (2009).

### F.   July 9, 2008

At approximately 9 a.m. on July 9, 2008, Bonner was interviewed at the Dauphin County prison by troopers Hershey and Martin. Bonner was informed of Miranda and signed a waiver of rights form indicating that he was willing to speak outside the presence of his attorney. Notably, aside from a blanket statement in a legal brief claiming that "the police failed to provide [defendant] with his proper Miranda rights," (Doc. 113 at 11), Bonner offers no evidence to contradict the testimony of troopers Hershey and Martin. The court finds that both troopers presented consistent and credible testimony, and credits their version of events. Accordingly, the statements made to these troopers are admissible for Fifth Amendment purposes.

At approximately 1:40 p.m. on the same day, Bonner was transported to the Swatara Township police department for a follow-up interview with Haney and Endy. The government concedes that Bonner was not provided with Miranda warnings prior to this interview, but that he was provided with a target letter explaining, *inter alia*, that he had a right to court-appointed legal representation. Endy then showed Bonner a series of photographs and Bonner answered several

19

questions concerning the individuals depicted in the photographs.  Bonner argues that the government's acknowledged failure to provide <u>Miranda</u> warnings prior to this interview requires suppression of defendant's statements.  The government essentially concedes this point, stating that "it does not intend to introduce in its case in chief the statements provided by the defendant to Special Agent Endy and Detective Haney on July 9, 2008." (Doc. 267 at 12.)  The court finds that any inculpatory statements supplied by Bonner during this interview were obtained in contravention of the Fifth Amendment and therefore requires suppression.

In addition to his arguments proffered under the Fifth Amendment, Bonner contends that a handwritten list of names and telephone numbers was stolen from him during the July 9 interview with Endy and Haney.  Specifically, Bonner claims that he broke from the interview to smoke a cigarette with Haney, leaving his paperwork in the interview room with Endy.  Allegedly, Bonner later realized that the handwritten document was missing.  (<u>See</u> Doc. 239 at 116-17.)  The Fourth Amendment's prohibition against "unreasonable searches and seizures" requires officials to obtain a warrant before searching persons or property.  <u>See</u> <u>United States v. Arvizu</u>, 534 U.S. 266, 573 (2002).  One who voluntarily consents to a search or seizure, however, cannot later assert that his or her Fourth Amendment rights were violated.  <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973).  Voluntariness of consent is judged by assessing the totality of the circumstances.  <u>See</u> <u>United States v. Price</u>, 558 F.3d 270, 277 (3d Cir. 2009).

In the matter *sub judice*, the court finds that Bonner voluntarily provided Endy and Haney with the document in question. Endy testified that Bonner freely supplied the document in question at the beginning of the interview, that "he wanted to provide [the information] to us," and that no threats or promises were exchanged in order to obtain the document. (See Doc. 239 at 88-89.) The court credits Endy's version of events. Not only was Endy's testimony credible and forthright, but it is also consistent with the totality of circumstances. Bonner had been cooperating with law enforcement for two months. He had willingly supplied extensive information both with respect to his own involvement in several robberies and the involvement of others. Bonner's voluntary provision of additional incriminating information is entirely consistent with his past behavior. In short, the court finds, as a matter of fact, that Bonner voluntarily provided the handwritten document to Endy, and that his provision of this document was not coerced. See Price, 558 F.3d at 278 (explaining that courts should consider the characteristics of the accused and the nature of the investigation when assessing the totality of the circumstances). Therefore, defendant's Fourth Amendment claim shall be rejected.

**III.    Conclusion**

For the foregoing reasons, the court finds that the statements Bonner made on May 14, 2008, May 19, 2008, May 20, 2008, and June 18, 2008 were not obtained in contravention of the Fifth or Sixth Amendments. The court also finds no constitutional infirmity in the statements obtained from Bonner on July 9, 2008 by troopers Hershey and Martin. However, the court shall suppress any inculpatory

statements made by defendant on May 13, 2008 during his evening interview with

Kurtz and O'Connor, and on July 9, 2008 during his interview with Endy and

Haney.  Finally, defendant's motion to suppress evidence pursuant to the Fourth

Amendment shall be denied, as the court concludes that defendant voluntarily

relinquished a handwritten document on July 9, 2008.

An appropriate order follows.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:      April 20, 2010

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:09-CR-0072-02** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **CHANCE D. BONNER** | : | |

## <u>ORDER</u>

AND NOW, this 20th day of April, 2010, upon consideration of defendant's

motion (Doc. 97) to suppress evidence, and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that the motion (Doc. 97) is

GRANTED in part and DENIED in part as follows:

1. The motion is GRANTED with respect to any inculpatory statements
   made by defendant during (1) the May 13, 2008 interview with
   Detective Jeffrey Kurtz and Detective John O'Connor; and (2) the
   July 9, 2008 interview with Agent Scott Endy and Detective George
   Haney.

2. The motion is DENIED in all other respects.


                                              <u>S/ Christopher C. Conner</u>
                                              CHRISTOPHER C. CONNER
                                              United States District Judge